Good morning. We're at our third and final day at the Texas A&M Law School, and they've been just so hospitable. I think I've gained five pounds, but other than that, it's been a great experience. The first case on our docket this morning is 23-20602, United States v. Lucas. Mr. Martin. May it please the Court, Scott Martin for Mr. Lucas. In this appeal, Mr. Lucas challenges the restitution order entered by the District Court after he pled guilty pursuant to a plea agreement to a charge of conspiracy to commit bank and wire fraud. Under the MVRA, that's the Mandatory Victim Restitution Act, the restitution awarded must have either been for a victim of the offense of conviction or, if agreed to by the parties in the plea agreement, to a person, quote, otherwise the order exceeds the statutory maximum and is an illegal sentence. With that in mind, we're asking the Court to do two things in this case. First, this Court should vacate the $133,000 award to the Social Security Administration because that agency was not a victim of the scheme for which Mr. Lucas was convicted, and Mr. Lucas did not agree in his plea agreement to pay restitution to the Social Security Administration. Any award to that agency, which is a non-victim, exceeds the MVRA's upper limit of punishment and thus is an illegal sentence because the Court had no authority to do this. Second, this Court should vacate all four of the awards to the auto dealerships because they too were not victims of the scheme for which Mr. Lucas was convicted, and Mr. Lucas did not agree in the plea agreement to pay those dealerships. We're asking that the Court remand, with respect to those awards, to the District Court to conduct further fact-finding on the amounts owed to the lenders, who are the ones who actually suffered harm in this case. Now, first I'm going to address the appeal waiver because the government has said it's going to enforce the appeal waiver. The appeal waiver does not bar Mr. Lucas' challenges to the District Court's authority to order restitution to these non-victims. If you look at the plain language of the plea agreement, paragraph 19 at row 1634, that's got the appeal waiver for restitution. The words, the victim, appears not just once but three times. Mr. Lucas agrees to, quote, to pay full restitution to the victim, regardless of the count of conviction, and stipulated that the victim incurred a monetary loss of at least $50,000 and agreed that the Court will determine the amount of restitution to fully compensate the victim. What language is conspicuously absent from this paragraph? Well, it's the phrase, persons other than the victim. Surely the phrase, the victim, cannot mean persons other than the victim. That would make no sense and would be an egregious bait-and-switch. The agreement to pay full restitution to the victim, regardless of the count of conviction, that's the phrase, full restitution to the victim, regardless of the count of conviction, construed narrowly against the government, which is the drafter of this disagreement, and we know from cases like Kim we are supposed to apply ordinary contract principles. It means no matter what count in the indictment Mr. Lucas pled to, Mr. Lucas would pay restitution to the victims of the scheme described in the indictment and the factual basis in the plea agreement. And the victims that are identified in those documents are the small business SBA and the banks or the financial lenders who finance the auto loans. Our position is that the plea agreement and the indictment kind of describes the acts pursuant to the scheme, which is the universe of acts for which restitution can be ordered in this case. There's no evidence of a mutual understanding that the Social Security Administration was the victim of this offense. We know from cases like Lozano and Adams that you can look to indictments and plea agreements and statements by parties to determine what the mutual understanding was. The highly detailed six-page factual basis in the plea agreement does not mention disabled widower benefits even once. It does not even mention the Social Security Administration. The scheme described in those documents involved inflating the revenue and payroll of JSM, Jesus Survives Ministries, which is Mr. Lucas' company, when filing applications for auto loans and PP loans and EIDL loans that were backed by the SBA. Nothing about an application for disabled widower benefits. Also, you have the 28-count second superseding indictment, which is 50 pages long. It does not mention disabled widower benefits even once. And at the guilty plea hearing, it wasn't mentioned there either. In the same vein, there's no evidence of a mutual understanding that the auto dealerships, rather than the lenders who actually financed the loans, were the victims here. The indictment describes, quote, the purpose of the scheme was to make false statements and use false documents regarding JSM to fraudulently obtain loan proceeds. And then it says that the co-conspirators made false statements regarding their payroll from JSM in submitting car loan applications to banks. It doesn't say they submitted these applications to auto dealerships. And we know just from real life, that's just not how it works. The banks are the ones who financed the loans. Then it describes, the indictment describes how Lucas secured loans from banks and finance companies like American Finance Corporation, which is at row 677-79. The factual basis of the plea agreement explained that, quote, Lucas, Deborah, and Corpion, that's Mr. Lucas' stepson, made false statements regarding payroll from JSM in submitting car loan applications to banks or financial lenders for the purchase of cars at multiple dealerships. And car loan applications were sent through the Internet to banks or financial lenders whose servers were outside of Texas. So, again, there was no mutual understanding, or there's no evidence of a mutual understanding that the auto dealers were, rather than the lenders, were victims in this case. Now, the substance of why the Social Security Administration was not a victim here under the MVRA. First, even if we assume, and we deny that there was any fraud here, but if we assume that Mr. Lucas defrauded the Social Security Administration, there's no evidence that this was an act, quote, pursuant to the scheme for which he was convicted. That's the language that's used in cases like Lozano. And as this court has said, you know, the word scheme in the restitution context is not a panacea that can cover all of a defendant's bad acts. The bad acts must be pursuant to the scheme, and the harm to the victim must be a direct result of those bad acts. What was the scheme here? Again, the scheme involved inflating JSM's revenue and payroll and applications to obtain auto loans from the finance companies and the banks, and PPP and EIDL loans from the SBA. The victims of this scheme are not auto dealers, and they're not the Social Security Administration. Twenty-eighth count, second superseding indictment, doesn't mention disabled whatever benefits. It said the purpose of the scheme was to make false statements and to use false documents regarding JSM defrauding the obtained loan proceeds. That's at row 673. There was no allegation that Mr. Lucas provided false documents or information about JSM for the purpose of receiving disabled whatever benefits from the Social Security Administration. And also, if you look at the highly detailed six-page factual basis in the plea agreement, it doesn't mention disabled whatever benefits or the Social Security Administration even once. Going one step further, let's assume as for whether Mr. Lucas was entitled to these benefits or not, we've argued that he was. We argue that the district court wrongly assumed that Mr. Lucas defrauded the Social Security Administration of these benefits, that this was clearly erroneous. First of all, contrary to the district court's view, his writing, I am not married on his application for the disabled whatever benefits, pretty weak evidence of fraudulent intent, given that his marriage to Deborah, which is his wife at the time he applied in Texas, was void in Nevada. And he's not a lawyer. He doesn't know about how the law of the domicile controls when you're applying for Social Security benefits. Assuming we agreed with you on one or more of your positions, why wouldn't we just remand to the district court for correction of the judgment? Well, so there's two parts. My answer has two parts. For the Social Security, for the with or disabled benefits, our position is that the Social Security Administration is not a victim, and therefore there should be no award of restitution at all. So it would be an illegal sentence for any adult, even $1, to go to the SSA in this case. Now, as for the auto, the loans for the automobiles, we are suggesting that because these dealerships were not victims and there's no evidence that they were victims, but that we are conceding that there is some loss here to the lenders, that in this particular case we should remand back for further fact-finding on the amounts owed to those lenders, not just to correct the judgment, to put in the correct names of the finance companies, like Honda Financial Company instead of the dealership, or J.P. Morgan Chase Bank instead of the West. Jumping back to the vehicle loan restitution order, am I right that you don't dispute that your client owes the amount, you just argue that it's been awarded to the wrong person? No, Your Honor. We have two parts. We first argue it's been awarded to the wrong person. All the awards to auto dealerships instead of lenders. So all four of them are wrong persons, right? With respect to at least two of them, the Subaru and the Honda, we do contend those are the wrong amounts. And the argument here is that, you know, basically, for example, the award to the excessive restitution awards for Spring Break Ranch Honda. But why wouldn't, if you're arguing there was a calculation error, if that error doesn't exceed the statutory maximum, why wouldn't that error be barred by the appeal waiver? Well, our position is that you cannot agree to, in cases like Kim, it says that the parties, the defendant, prosecutor, and court cannot, they can agree on a sentence, but they cannot give the sentence effect if it is not authorized by law. And if you have amounts, dollars that aren't supported by the record evidence, and it was a clearly erroneous award based on the facts, that can't stand. The court has no authority to award those dollar amounts. So basically, this case is not like the Miller case, which they've cited in their briefs, where, okay, everyone agreed that you just mixed up the names of who you should pay the restitution to, and let's just fix the names. No, here we've got not just the names, but we also have, especially with respect to two of the loans, the ones for the Honda and the Subaru, disputes about the amounts. And so it would be appropriate, with respect to the auto loans, to send back for further fact-finding what the correct amounts actually are. If we disagree with you on whether or not there was fraud for the Social Security Administration, who would the victim be? Well, there is no victim. Our position is that there is, that is a different scheme. Let's assume that there was fraud. That is not the scheme for which Mr. Lucas was convicted in this case, and it is outside the scope of the facts that were agreed to by the parties in the plea agreement and that were charged in the indictment. And so that, you know, assuming if there was fraud on the Social Security Administration, that is not a fraud that's been in the context of this case and not one that the court has authority to award restitution for. So we were talking about the... Were you counsel below? No, Your Honor. We were, I was, my office was appointed around Christmas this year. We, we, he had a separate, he had separate trial counsel, and then he had an appellate counsel who was appointed, but then the appellate counsel had to withdraw after the briefing because she left to take a position with the District Attorney's Office. So we took the appointment in December. Okay. I'm asking because I'm circling back to the correct amount of restitution for the vehicle loans. On the merits that the loan amounts were miscalculated, I thought there was a, I could be misreading, but I'm looking at page 1535 of the record, and there seems to be a concession before the district court that the calculation was correct. So after announcing the restitution amount, the district court says whether that award accords with what Mr. Lucas had calculated, and counsel replied, based on the information I provided, that sounds about appropriate. And I didn't know if that was tantamount to a concession and how that could now be challenged on appeal. Well, our argument is that was, yes, that was said, but that was not a concession because basically the probation officer was calculating restitution in real time at the sentencing hearing. And I think that what happened here is that a mistake was made by defense counsel in agreeing to that, and an error was basically induced by the probation officer, which was not one that the defense counsel induced. It was an invited error. And it wasn't, you know, it was at most a forfeiture, but certainly not a waiver, not a knowing waiver of the issue of the amounts that are owed to the auto dealerships. Final question, 20 seconds left. So do you disagree that whether for purposes of this appeal, whether the proper victims were the dealerships or the lenders, as far as who the proper victim is, do you disagree that either way your client is paying the same amount of restitution? I disagree that our client should be paying the same amount of restitution. Our argument is that the amounts, particularly for the Honda, Spring Branch Honda, and West Houston Subaru should be lower. I know you argue that it was miscalculated, but putting the miscalculation aside, just looking at the sum total, I know you think that the victims were misidentified, lenders versus dealerships, as to who the proper victim is. Right. But assuming the total is correct, either way, the restitution, the amount, is the same. You're just quibbling over who the proper victim is. No, Your Honor, respectfully, I believe that the total amount should be reduced when you calculate the proper amounts that the lenders recovered for the collateral and the sale of the vehicles, which was somehow missed at the sentencing hearing, and also there was a judgment, a civil judgment, for the Subaru where the lender got money back from that, and that was missed. And so the actual total amounts of restitution should be reduced. And that's why we're asking the court to remand for further fact-finding so that can be ironed out. We already know they've got the wrong victims on there, and there's at least two of them that we dispute the amounts. You didn't object in the district court, right, or your client didn't? We did object to who the victims were. About the amounts, the calculations? Well, we did object to the calculations. On this basis? Well, as Judge Willett said, when the total number was calculated by the probation officer at the sentencing hearing, defense counsel did say, that sounds about right. That was improvident. That was incorrect, because what we know now from the documents, what we can see from the documents in the record, the defense exhibits, that the government did not dispute at the sentencing hearing, that there seems to have been some credits that weren't applied to the method of calculating that number was wrong, that the amounts owed to two of the lenders should be J.P. Morgan Chase Bank. Did someone object in the trial court to those particular amounts? Yes, we did specifically give amounts that we believe, for example, that were lower, and are at row 1724, regarding restitution. He argued that it is not only restitution of the car dealerships, because they were not the finance provider and thus did not have no loss. He concedes, however, the following restitution amounts to the vehicle lenders, Honda Financial Services, $15,791, and $23,813, and Toyota Financial Services. That's at row 1724. The number that came out of the calculus by the probation officer at sentencing came in higher than that. We're saying that this shall be sent back for recalculation for further fact-finding because of this. Are we here on plenary review or de novo? Well, I think that it's de novo with regard to the – certainly with respect to the – I'm asking about the dollar amounts. The dollar amounts. Well, I think that would be – because of the concession that was made at the sentencing hearing, that would be plain error. But it does dovetail with the harmlessness analysis of awarding to the wrong victims in the first place. I mean, we're arguing that the government – our position is the government can't show that the error of awarding restitution to the wrong victims is harmless because we have documents in the record that show that some of these – I'll take your point. I'm just trying to – Yeah. Thank you.   May it please the Court. Andrew Sand for the United States of America. I'll start off by talking about the car loan restitution issue. So what happened at sentencing was my opposing counsel, he talks about how there was an amount at ROA 1724. That's part of the pre-sentencing objections to the PSR. So what happened at sentencing was regarding the car loan issue is the district court and the parties agreed to a pre-offset amount, which was around $273,000. That's at ROA 1499. Then the parties and the district court agreed that that amount should be offset by some value associated with the repossessed vehicles. That's also at 14 – ROA 1499. And that is exactly what Mr. Lucas got. He got a very large offset that went from $273,000 to approximately $149,000, which is about 45%. And then after that final number was calculated at sentencing, the district court presented that number to the parties and Mr. Lucas stated, based on the information I provided, Judge, that sounds appropriate. So he did concede that that was a correct number. So the miscalculation aside, how do you respond to opposing counsel's argument on the victim? So, yes, Your Honor. So regarding the victims, I think that's a distinct issue from the SSA restitution issue because there's no dispute here that the dealerships and the lenders were harmed by the offense of conviction. Our position is that the district court made a reasonable conclusion that the dealership was the appropriate restitution recipient. Mr. Lucas, he walked into the dealership to buy a car. He took a loan on site to purchase that car, and most of the lenders appear to be with the same corporate entity, Honda Financial Services, Toyota Financial Services. Those are the same corporate entity as the dealership. So our position is that the district court made a reasonable conclusion that the dealership is the proper recipient of the restitution. But, as we argued in our brief, if necessary, and this court determines that the lenders are the appropriate recipient, that can be corrected by under Rule 36. Judge Willett, regarding your point about the amounts with regard to the car loan restitution, we agree. This is barred by the appeal waiver. We think this is squarely controlled by this court's precedent in Meredith, in which this court said a defendant can't use the statutory maximum exception as an escape hatch to avoid appeal waivers. The claim there is eerily similar to the claim here. In Meredith, the defendant raised a restitution challenge in the face of an appellate waiver that it was basically a calculation challenge. He argued that the restitution should have been offset more by the dividends associated with his Ponzi scheme. Here, it's an analogous type of claim. Mr. Lucas is arguing that the restitution amount, which he agreed to at sentencing, should be further offset by some value associated with the repossessed vehicles. Rule 36 speaks to clerical errors, correct? Yes, Your Honor. What's your best case to say that awarding damages to the wrong victim is a clerical error? Yes, Your Honor, it was discussed in our brief. It's Fultz, and that's at 71. But in the Fultz case, there were additional victims who were omitted. That case does not stand for the proposition that there were the wrong victims to begin with. There were just two victims who were omitted from that restitution. Our position is it is analogous. I think Fultz actually is different because the victims were omitted, whereas here, the victims are either the dealerships, the proper recipients are either the dealerships or the lenders. There's no dispute about that. So I think our primary position is that the district court made a reasonable conclusion that it's the dealerships. But if this court thinks that was incorrect, then I think it should go to, then we're not disputing that it would be okay for it to go to the lenders. I guess my basic question is you agree some amount is owed. As the two dealerships, there's some dispute. But these companies, they're related. We don't know exactly how. They're not complaining. Why are you complaining? Your client's going to owe restitution a very close amount to these people. Yes, Your Honor. I think the government is not complaining whatsoever.  Why do you think he is complaining? I'm sorry. I misphrased that. I don't know why he's complaining from the government's point of view. He has wronged a victim. He owes that amount of money. A challenge on that amount of money is barred by the appeal waiver. As the government, it is our job to make sure the proper recipient, the proper victim, gets that proper amount of restitution. So we don't have a problem. We think the district court made a reasonable conclusion. But if this court disagrees with that, we want to make sure that that restitution amount goes to the proper recipient. So that's why we think Rule 36 would be appropriate. I can't speak to why Mr. Lucas has a problem with the... I misstated that.  Yes, Your Honor. So that's where we stand on the car loan restitution issue. I would like to briefly clarify our position on the SSA restitution issue. We do agree with opposing counsel that should this court view Lucas's SSA restitution challenge as claiming that the SSA's losses did not result from the scheme of his conviction of offense and concluded to be meritorious, this claim is not barred by his appeal waiver. But we maintain, however, that his SSA restitution challenge fails on the merits. As argued in our brief, we believe the district court got it right and it reasonably concluded that the SSA fraud was part of the scheme of the conviction offense. This is based on several factors. The first factor is exactly what the district court said at sentencing, which is, quote, the SSA fraud is at a level of generality of a kind exemplified by the conduct of the defendant here in relation to his JSM fraud, including, quote, false submissions to government entities for government benefits. The indictment... Here's how the indictment defines the purpose of the scheme. To make false statements and use false documents regarding JSM to fraudulently obtain loan proceeds. That's how the indictment expressly defines the scheme's purpose. And I don't see how the Social Security benefits fall into that scheme. They don't involve the creation of false documents. They're not about JSM. They're not directed at obtaining loan proceeds. So how were they part of the same scheme or conspiracy? I think this is the exact discussion they had at sentencing, which is about levels of generality. And I think the district court took it at a higher level of generality, which was the district court looked at it as a pattern of submitting false documents to gain improper financial benefits, most of them government benefits. So the district court did not limit it to express JSM-associated schemes. That's why I quoted how the indictment expressly defined the purpose of the scheme, and it was not quite as gauzy and nebulous as we're talking about. It seemed pretty specifically contoured. So do you have a case from our jurisdiction, any jurisdiction, to support the argument that the disability benefits were part of the same scheme as the fraudulent loans? Yes, Your Honor. I think the case we would point this court to is United States v. Cawthorne, which is at 302 F.3 297. And in that case, that case basically involved a defendant who defrauded his computer suppliers between 1996 and 1998. Ultimately, he pled guilty to only one count, which only related to one instance of computer supplier fraud in 1998. And this court held that, although we sometimes have struggled to define the outer bounds of a particular fraudulent scheme, we have focused on the actions alleged in the indictment and their temporal scope. The court ultimately, the issue was whether the restitution was appropriate for the broader scheme between 1996 and 1998, or just the count that was pled to, which was only in 1998. The court looked at the indictment and then ultimately looked at the plea agreement, which suggested a larger scheme and held that the schemes for the entire three-year period were proper for the restitution. And I think that goes to a second factor that is relevant here, which is the temporal scope, right? So the indictment, paragraph 44, talks about how from 2017 to 2020, Lucas, Debra, and Corpian conspired to commit wire fraud and bank fraud. That time frame overlaps with the SSA fraud. The SSA fraud began in 2018. It went to 2023. It overlapped with every single part of the Jesus Survives ministry frauds, including the PPP loan fraud, the EIDL loan fraud, the FTC identity fraud. It overlapped with all of them. So the temporal scope, there is temporal overlap there. But is the temporal scope enough? We believe that by itself. I can't say it's enough, but we have the temporal scope. We have at least a similar pattern of behavior, submitting false documents to government entities to gain improper government benefits. But it was conduct that was never charged and never discussed as part of the plea agreement. And it's conduct that, at least in my view, is hardly related to the charged offenses at all. There could be more factors indicating relation, but this is what we have to go on with the record in front of us. And the last kind of factor I'd point this court to is Diane's house. So in 2014, Diane, which was Mr. Lucas's alleged second wife, she died. Mr. Lucas claimed to be her widower, which is obviously part of his disabled widower benefits fraud scheme. And then he used that claim to obtain her house at Larkspoor Landing, moved there with Deborah and Corpian, and then later on that house became the listed residence for Jesus Survives Ministries in every single part of the fraud schemes. So there is some overlap in facts as well. We're not asking for forfeiture of the house. We are not. But I think the issue here is kind of the relationship between the SSA fraud scheme and the other schemes relating to Jesus Survives Ministries. So looking at the plea agreement, jumping back to restitution and the statutory limits. So Mr. Lucas agreed, quote, to pay full restitution to the victim and that, quote, the court will determine the amount of restitution to fully compensate the victim, unquote. So as I read the plea agreement, yes, Mr. Lucas agreed to let the district court calculate the restitution, but he only agreed to pay what was necessary to compensate the victim. Yes, Your Honor, and I think that is what is at issue here is whether the SSA is a proper victim, whether the SSA's losses resulted from the conviction offense scheme. Or the car dealerships. Right. Yes, Your Honor. Or the car dealerships, though we think those are distinct claims because there is no dispute that either the car dealerships or the lenders, potentially both, were harmed by the offense conviction. That is distinct because that is expressly discussed in the indictment and the plea agreement. But as we stand now, it does not sound like there is restitution to the lenders. There is not because we believe that they are the proper, that the dealerships are the proper recipients. What was the loss to the dealership? The loss to the dealership, I think it's because, I can't speak to how the district court contemplated it, but the district court indicated that the dealership was the one who suffered that loss, maybe via through the lenders. Because I think if Honda Lending and Honda the dealership were being sued as defendants, and some plaintiff had sued the wrong entity, I just don't foresee that we would be making the same argument that those two are interchangeable. I'm not quite sure if that is correct because, at least from my perspective, I think they are West, sorry, Spring Branch Honda and Honda Financial Services. To me, they do seem like the same entity. At a minimum, they have a strong contractual relationship with themselves. So in your hypothetical, if there is a lawsuit, then at least their relationship would get figured out in the course of that lawsuit. But I think here it was a reasonable conclusion for the district court to find that the dealership was the proper recipient of the restitution. It's just a minor point. So you filed a motion for summary affirmance initially. Yes, Your Honor. And you argued there that the restitution award was ordered under the Victim Witness Protection Act. Yes, Your Honor. Not the Mandatory Victims Restitution Act. You don't repeat that argument, at least not expressly, in your merits briefing. And I didn't know if that was still in your position. I think the record is mixed under which statute the restitution was imposed under. There is some indication in the record that it was under 3663, which is the Victims Restitution Act. But because of the nature of the offense, which is conspiracy to commit wire fraud and bank fraud, it should fall under the MVRA. I don't think that matters for the analysis going on because the restitution, the two restitution statutes, 3663 and 3663A, they work in tandem together. Mr. Lucas has challenged that the dealerships were not the proper victims for purposes of receiving restitution. Do you think Mr. Lucas adequately addressed that issue on appeal? Did he press it firmly enough? Our perspective, no. That seems like a very secondary benefit, secondary argument associated with— Well, I think there was only a single sentence or two in the opening brief, and that was about it. Yes, Your Honor. I don't think that's sufficiently pressed. My perspective is he's mainly challenging the amounts associated with the car loans, which is barred by the appeal waiver. So, yes, our position is he didn't sufficiently press it. Pending any further questions, we respectfully request this court affirm the district court's judgment.  So picking up where we left off, the appellate counsel in the opening brief did state on page 30 that appellant argues the restitution order is in a legal sentence, not authorized by the MVRA because it failed to order restitution to the victim. Is that the single sentence that was just referenced? A legal sentence. And then it goes on, and we do— No, I said is that the single sentence. Is that all you say in the brief? No, there are other—I believe that there's other instances. My apologies. That was not the original draft of this brief, but— I was looking at the blue brief at page 24. There's a sentence that says, in a second point of error, appellant argues the district court erred in ordering restitution to the auto dealerships because it was the lenders for the motor vehicle loans that suffered loss, and that was really the only sentence I saw in support of the argument. That's correct that the brief doesn't go into any greater analysis, really, about the victim and the question of whether the dealerships were victims or not, but it was generally understood in the district court as well. For example, at page—at row 1494 to 96, the district court and the government both recognized and agreed that the cars were, quote, secured property for the loans financed by banks, who as the, quote, original loan holders would be the ones to repossess the cars, and, quote, to shore up their downside and go on and sell them so they're not out as much money. And, of course, that's at 1494 to 96. The district court, everyone—I mean, all through this case, everyone has understood that the dealers are not the—the dealerships are not the victims. This showed up for the first time, really, in the red brief, the government's briefing. And, you know, the government had, at row 1499 in the district court, said it had no objection to documents establishing what the vehicles were sold for. And this document showed that it was the banks and the finance companies who were repossessing the cars and selling them. If I may, I'd like to turn quickly to the Social Security fraud issue. We've pointed out, Your Honor, in the status of his marriage to—whether it was, in fact, fraud, you know, the status of his marriage to Deborah, our position is that was likely not a material fact. Because in the website, Social Security website that the government cites in its brief when it's making this argument that, oh, it must have been fraud because he was married to someone else when he applied, the Social Security website talks about, in section RS-207-003, about how—it's called how remarriage affects the WIDRO benefits. And under this—Mr. Lucas may, in fact, fall under this exception because he was a disabled WIDRO. He was at least 50 but not 60 at the time of the application in 2018. He remarried after attaining age 50 in 2014 when his marriage to Deborah became valid in Texas, in Texas according to the government. And in his application, he stated he had become disabled on November 12, 2013, which was before his marriage to Diane ended by death. And so that's actually all explained quite clearly in the regs and statutes that are cited in the Social Security Administration's website. Am I wrong? I thought according to the PSR, Mr. Lucas admitted that he was never legally married to Diane. That's what he stated. Yes, he stated that. But the government's position is that he was legally married to Diane and that his marriage to Deborah became valid when Diane died in Texas. I guess the assumption is that he had a common-law marriage to Deborah in Texas but that his marriage was void in Nevada because he was married to someone else when he married Diane. The details of it get pretty confusing. But just to say the government's position that just because he was married to someone else when he applied doesn't mean that it was fraud for him to apply on Diane's account because of this remarriage exception. I would like to point out one last thing, and that is that this issue about whether or not the Social Security fraud was close enough or related enough seems to be importing this idea of relevant conduct from the guidelines into the restitution context, when in fact that restitution does not you can't just import those concepts into this. The NBRA has its own set of rules, which we've discussed. They have to be losses that result from acts that were pursuant to the scheme for which he was convicted. That's clear from Lozano. But even if you looked at relevant conduct, which we say you shouldn't do because the scope of all the conduct that's relevant is defined in the factual basis for the plea agreement and the indictment. Even if you looked at that, was this part of the same common scheme or plan and the relevant concepts? No. I mean, you don't have common victims. You don't have common accomplices. They're a common purpose or a similar MO. You know, the victims you don't want, the Social Security Administration is not an auto lender, and it's not the SBA, and it's not the FTC. And we know from the forfeiture cases that, you know, the type of cases that government entities are treated as like separate victims. That's why you can't have forfeiture and restitution in a single case, because the DOJ and FEMA are not the same person. But also common accomplices. No evidence that Mr. Lucas acted with anyone else to submit this application for disabled widower benefits. Common purpose, no. Obtaining disabled widower benefits is not the same as obtaining loan proceeds from banks or the Small Business Administration. And finally, similar MO. This is all from, you know, 1B1.3, the commentary for relevant conduct. No, Mr. Lucas didn't use false documents about JSM to apply for disabled widower benefits from the Social Security Administration. Unless the Court has any further questions, I'll go ahead and rest on the briefs. Thank you. Thank you, Counsel. We had your arguments.